# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RODRECIUS ANTONIO HAMILTON,

      Plaintiff,

v.                                                  Case No. 8:18-cv-885-T-02TGW

JEREMY WILLIAMS, JOEL MAILLY,
and JUSTIN KING,

      Defendants.

_____/

## ORDER

This motion comes before the Court on the Defendants' Motion to Dismiss, Dkt. 31, Plaintiff's Second Amended Complaint, Dkt. 17. The Plaintiff filed a response in opposition to the Motion to Dismiss. Dkt. 35. After reviewing these documents, the Court denies Defendants' motion.

## BACKGROUND

This matter is before the Court on the Plaintiff's Second Amended Complaint for Violation of Civil Rights. Dkt. 17. The Plaintiff, Rodrecius Hamilton, makes Fourth and Fourteenth Amendment violation claims against the Defendants under 42 U.S.C. § 1983. The Defendants, Jeremy Williams, Joel Mailly, and Justin King are police officers with the Lakeland Police Department.

The Plaintiff alleges that on April 19, 2016 at approximately 11:15 PM, the Defendants "snuck up and surrounded the Plaintiff's home[.]" Dkt. 17 at 4–5. It is undisputed that the "reason for this intrusion was to investigate a misdemeanor battery which allegedly occurred the day prior, April 18, 2016 at approximately 3 PM." Dkt. 17 at 5; Dkt 17-1 at 5; Dkt. 31 at 6. According to the police reports, there was an argument between the Plaintiff and David Rogers which led to the Plaintiff putting "Rogers in a 'headlock' and repeatedly [striking] him in the face with a closed fist[.]" *Id.* A third person was able to separate them, and Rogers left the area and contacted the police. *Id.* Rogers did not know where he was and gave the wrong address, so the officers could not pick him up, but he went to the police station to file a report. *Id.* The officer noted that he "observed swelling and redness around Roger's right eye, which was almost swollen shut, as well as both of his eyes were bloodshot due to the strikes to the face." *Id.* Yet the officer listed the extent of these injuries as being "minor injuries" in his report. *Id.*

The Plaintiff alleges and Defendants do not dispute that the Defendants did not obtain an arrest or search warrant before approaching his home. Dkt. 17 at 5. The Plaintiff alleges that he "[sensed] the men dressed in dark clothing running towards his home. The men never identified themselves as police officers." *Id.* The Defendants dispute this and claim that they did identify themselves and that they were wearing Lakeland Police uniforms which are black with orange patches on

both sleeves. Dkt. 17-1 at 8–9. Further the Defendants assert, per their police reports which were attached to the Second Amendment Complaint, that the Plaintiff stated post *Miranda* "that he saw us and knew we were the police and that was why he ran back inside." Dkt. 17-1 at 7–8.

Defendant Williams' police report, stated that as "[the Defendants] approached the residence the [Plaintiff] came outside onto the covered patio at the rear of the residence." Dkt. 17-1 at 8. It is undisputed that upon seeing the Defendants the Plaintiff ran back into his home. Dkts. 17 at 5 & 17-1 at 9. It is also undisputed that Defendant Williams chased the Plaintiff into his home by forcing his way through the closed door. Dkt. 17 at 5; Dkt. 17-1 at 9; Dkt. 31 at 8. At which point the Plaintiff alleges Defendant Williams "release his K-9" and the dog attacked him. Dkt. 17 at 5. Defendant Williams asserts that he "began to give [Plaintiff] verbal commands to come here and stop or I'd release the dog ([Plaintiff] had begun to slowly move backwards towards a hallway)." Dkt. 17-1 at 9. Defendant Williams stated the Plaintiff did not follow his instructions and instead "began to yell at me what was going on" and retreated "back down the hallway." *Id.* According to Defendant Williams, this is when he released the dog which bit the Plaintiff in his lower left leg. *Id.* Defendant Williams asserts that Plaintiff tried to push the dog away and yelled at him to get the dog off. *Id.* But Defendant Williams did not remove the dog because he "saw no indication that the

[Plaintiff] was surrendering or complying with my commands." *Id.* Defendant Williams then "moved in while the dog was still holding the bite on his leg and physically placed [Plaintiff] on his stomach, moved his arms to a position behind his back and handcuffed him." *Id.* Then Defendant Williams removed the dog. *Id.* It is undisputed that at some point during this altercation the dog bit the Plaintiff's other leg, but it is not clear when that occurred. *Id.*

At this point the Defendants assert that Defendant King took the Plaintiff to Lakeland Regional Medical Center. *Id.* However, the Plaintiff alleges that Defendant Williams "kick[ed] him several times in the ribs and legs." Dkt. 17 at 7. Further, the Plaintiff alleges that both Defendant Mailly and King entered his home and kicked and beat him. Dkt. 17 at 8. Plaintiff alleges he sustained "lacerations, bruises, dog bites to both legs, and bruised ribs" from this encounter. *Id.*

The Plaintiff claims the Defendants violated his Fourth Amendment protections against unreasonable search and seizure and was subject to excessive force. Dkt. 17 at 3. The Plaintiff also claims that Defendants violated his Fourteenth Amendment right to due process. *Id.* The Defendants filed a Motion to Dismiss and asserted a qualified immunity defense. Dkt. 31.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the motion, the court accepts all factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted).

Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted). Courts may also consider documents attached to a motion to dismiss if they are (1) central to the plaintiff's claim; and (2) undisputed or, in other words, the "authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citations omitted).

## DISCUSSION

First, the Court must address the relevance and weight given to the police reports attached to the Second Amended Complaint. Then, the Court will review the Defendants' assertion that they are entitled to qualified immunity for the claims.

I.     Police Reports Attached to the Second Amended Complaint

It is the established law in this Circuit that "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009). The Eleventh Circuit in *Crenshaw* specifically noted that "the police reports add several relevant facts to the operative version of the incident, which, notably, do not conflict with any of [plaintiff's] allegations." *Id.* at 1291. In *Crenshaw* the court did not credit the "conclusory and speculative allegations about what the officers saw" and instead relied on the policer reports. *Id.* at 1292. While the court used the police reports instead of the complaint for conclusory allegations about what the officers saw or thought, the court still relied on the plaintiff's version of events to determine whether there was a constitutional violation. *Id.* at 1291–92.

In addressing this issue, a court in this District held that when the allegations in the complaint "are not general and conclusory, but are specific as to [defendant], the police report does not 'govern or control' in this case, even though the police report contradicts [plaintiff's] allegations against [defendant]." *Miffin v. Bradshaw*, No. 8:08-CV-592-T-33EAJ, 2009 WL 1953534, at *8 (M.D. Fla. July 6, 2009); *but see*, *Morris v. City of Orlando*, No. 6:10-CV-233-ORL, 2010 WL 4646704, at *5 n.3 (M.D. Fla. Nov. 9, 2010) (accepting without discussion the statements from an

arrest affidavit attached to the complaint as superior to the allegations in the complaint).

The Eleventh Circuit further clarified how to approach police reports attached to civil right complaints in *Saunders v. Duke*:

> Where a civil rights plaintiff attaches a police report to his complaint and alleges that it is false, as [plaintiff] did, the contents of the report cannot be considered as true for purposes of ruling on a motion to dismiss. Otherwise, officers sued under § 1983 could just attach police reports referenced in a civil rights complaint to their motions to dismiss and ask courts to consider the contents of those reports even if they contradicted the allegations of the complaint. And that, as we have said, would be improper.

*Saunders v. Duke*, 766 F.3d 1262, 1270–71 (11th Cir. 2014).

Here, Hamilton attached the police reports to his Second Amended Complaint. Dkt. 17-1. But his only reference to the reports was to show the reason the officers were at his home was to investigate an alleged battery which had occurred the prior day. Dkt. 17 at 5. While, unlike in *Saunders*, Hamilton does not specifically allege that the reports are false—or in any way mention them again after the reference to the prior day's activity—he does allege facts that contradict statements in the police reports. To accept the police reports facts as true would be contrary to the Eleventh Circuit's reasoning in *Saunders*. 766 F.3d at 1270–71. It is counterintuitive to, as the Defendants suggest this Court should, accept as true in a motion to dismiss the Defendants' own statements in their own police reports merely because the pro se Plaintiff attached the police reports to support a different

fact in his case. The Eleventh Circuit in *Crenshaw* and *Saunders* made clear that courts should rely on attached police reports for allegations that are merely "general and conclusory" in the complaint, but not for specific facts and allegations that expressly conflict with facts alleged in the complaint. The reasoning behind accepting Hamilton's version of the facts as true and not the version in the police reports is that same as the reasoning in *Saunders*, despite Hamilton not specifically alleging that the police reports were false. To accept the contents of the police reports when they contradict nonconclusory allegations in the complaint "would be improper." *Id.* at 1270–71.

While Defendants allege that the police reports "do not conflict with Plaintiff's factual allegations" a simple reading of the Second Amended Complaint and the police reports along with the specific facts the Defendants rely on in their Motion to Dismiss, reveals this to be incorrect. For example, in the Motion to Dismiss the Defendants state: "Defendant Williams's police report states that while he was approximately 20 feet from Plaintiff, he yelled to Plaintiff 'to stop and come to [him],' but the Plaintiff looked at Defendant Williams and ran back into the residence." Dkt. 31 at 7 (citing Dkt. 17-1 at 9) (alternations in original). But in the Second Amended Complaint, Plaintiff alleges that the Defendants "snuck up and surrounded" his home, that they "never identified themselves as police officers," and that all he saw was "men dressed in dark clothing running towards

his home." Dkt. 17 at 4–5. Here, common sense dictates that the Hamilton is alleging that the aspects of the police reports that say the police identified themselves or that he knew they were police officers are false since he alleges that they did not identify themselves.

Further the police reports themselves provide conflicting accounts of what happened. Defendant Williams' report states that they saw and apprehended Plaintiff at the rear entrance to the residence and that Plaintiff "took flight" after Williams had announced they were police officers. Dkt. 17-1 at 8–9. But Defendant King's report states that Plaintiff was at the front door and that he went back inside immediately after seeing the officers. Dkt. 17-1 at 10. Defendant King's report never mentions the officers identifying themselves before entering the Plaintiff's home. Dkt. 17-1 at 10. Therefore, even considering the police reports, in the light most favorable to Plaintiff, the officers did not identify themselves before chasing him into his home.

As the police reports were attached to the Second Amended Complaint this Court can and will consider them, but it will do so, as required for a motion to dismiss, in the light most favorable to the Plaintiff. As such, the Court will accept as true the factual allegations made by the Plaintiff in the Second Amended Complaint. The Court will also consider, from the attached police reports, the non-

conflicting facts and the facts that conflict with general or conclusory allegations in the Second Amended Complaint.

II.  Qualified Immunity

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"To claim qualified immunity, the officer first must show that he was acting within his discretionary authority when the alleged violation occurred." *Shepard v. Davis*, 300 F. App'x 832, 837 (11th Cir. 2008) (citing *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004)). After this is shown, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." *Id.* (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)).

To overcome a qualified immunity defense, a plaintiff must make two showings. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). First, he "must establish that the defendant violated a constitutional right." *Id.* Second, he must show the violated right was "clearly established." *Id.* The Court may address either prong "first in light of the circumstances in the particular case

at hand." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A Government official's conduct violates clearly established law when, at

the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently

clear' that every 'reasonable official would have understood that what he is doing

violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Essentially, "the object of the

clearly established immunity standard is not different from that of [a] fair

warning[.]" *United States v. Lanier*, 520 U.S. 259, 270 (1997). This analysis must

be undertaken based on the specific facts of the case, and not as a broad general

proposition. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

A plaintiff can demonstrate that the contours of the right were clearly

established in several ways. First, the plaintiff may show that "a materially similar

case has already been decided[.]" *Mercado v. City of Orlando*, 407 F.3d 1152,

1159 (11th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The

relevant inquiry is whether binding opinions from the United States Supreme

Court, the Eleventh Circuit Court of Appeals, or the highest court in Florida, exist.

*Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015). Second, the plaintiff can

point to a "broader, clearly established principle [that] should control the novel

facts [of the] situation." *Mercado*, 407 F.3d at 1159. Finally, the conduct involved

in the case may "so obviously violate[] th[e] constitution that prior case law is unnecessary." *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)).

Here, the Plaintiff disputes whether the Defendants were acting within their discretionary authority. Dkt. 35 at 2. But after reviewing the facts it is clear that the Defendants were acting within their discretionary authority as police officers for the Lakeland Police Department. To determine whether an officer was acting within their discretionary authority the "proper inquiry for the Court is 'not whether it was within the defendant's authority to commit the [alleged] illegal act (i.e., false arrest or excessive force).'" *Miffin v. Bradshaw*, No. 808-CV-592-T-33EAJ, 2009 WL 5067750, at *8 (M.D. Fla. Dec. 15, 2009) (citing *Habert Intern., Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir.1998)). "Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (citation omitted). "Thus, an official acts beyond the scope of his discretionary authority only if the injury occurred during the performance of an act clearly established to be outside of the limits of that authority." *Id.* (citation omitted).

Here, if done for the proper purpose, arresting the Plaintiff is reasonably related to the Defendants' duties as police officers. Therefore, the Defendants have met their initial burden in establishing qualified immunity. This means the burden

shifts to Hamilton to prove that the Defendants violated a clearly established constitutional right.

### III. Fourth Amendment Claims

Hamilton alleges that the Defendants illegally seized him when they entered his home to arrest him without a warrant. Dkt. 17 at 3–8. Hamilton also alleges that the force used during and after the arrest was excessive. *Id.* It is undisputed that the Defendants initially saw the Plaintiff while he was standing immediately outside his home and that he returned into his home before being arrested. Dkts. 17 at 4–5 & 17-1 at 9.

"An arrest is quintessentially a seizure of the person, and therefore subject to the Fourth Amendment's reasonableness requirement." *McClish v. Nugent*, 483 F.3d 1231, 1238 (11th Cir. 2007) (citing *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). Because the arrest of Hamilton occurred inside his home it is "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable.").

"Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). "Prior decisions of this Court,

however, have emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated,' . . . and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id.* at 749–50 (citing *United States v. United States District Court*, 407 U.S. 297, 318 (1972)). The Supreme Court stated their "hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor." *Id.* at 750.

While the burden is normally on the Plaintiff to prove that a constitutional violation was clearly established, the burden is on the Defendants to prove there was an exigent circumstance to validate entering the Plaintiff's home to arrest him without a warrant. The Defendants allege that "the officers had probable cause to believe that there was a danger of flight or escape, danger to the police officers or public in general, and that the officers were in hot pursuit of a fleeing suspect." Dkt. 31 at 12. Accordingly, the Court examines the Defendants' argument that they were in hot pursuit of a fleeing suspect.

The Defendants, correctly, point to *Santana* as the case which establishes "hot pursuit" for a chase that begins outside the home but leads to an arrest inside the home without a warrant. But the facts in *Santana* are distinguishable from the facts before the Court. In *Santana* the undercover officer drove to the drug house

with the individual buying heroin, watched her enter the house with the money, come back outside, and produce the heroin for him. *United States v. Santana*, 427 U.S. 38, 39–40 (1976). Upon returning to the car, driving away, and producing the heroin, the officer arrested her. *Id.* at 40. The officer then asked where the money was, to which she responded, "Mom has the money." *Id.* The officer notified the sergeant and the other officers about "mom Santana" and the house. *Id.* at 40. The other officers then immediately drove to the drug house where the saw the plaintiff (mom Santana) standing in the doorway with a brown paper bag in her hand. *Id.* The officers shouted "police" and the plaintiff backed into the home. *Id.* The officers proceeded to follow her into the home and arrest her. *Id.* at 40–41. The Supreme Court held "that a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Id.* at 43. The Supreme Court noted that "[o]nce Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence." *Id.*

The Supreme Court further analyzed this issue in *Wisconsin v. Welsh*, where the court focused on the severity of the underlying offense and whether there was an "immediate or continuous pursuit of the petitioner from the scene of a crime." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). The Eleventh Circuit has since held that *Welsh* clarified that "some sort of chase" means "the 'immediate or continuous

pursuit' of a suspect." *Hazleton v. Trinidad*, 488 F. App'x 349, 352 (11th Cir. 2012). Specifically, the Eleventh Circuit held that *Welsh's* holding "placed the officers on notice that the hot pursuit doctrine requires an 'immediate or continuous pursuit of [a suspect] from the scene of a crime.'" *Id.* at 353.

This differs from the facts associated with Hamilton's arrest inside his home. In *Santana*, the officers were acting continuously from the point of the undercover drug buy-bust until the arrest of plaintiff. Here, the Defendants were not pursuing Hamilton directly from the scene of the underlying offense or from any action associated with the underlying offense. Instead, the officers were approaching his home to arrest him 31 hours after an alleged misdemeanor battery occurred. Dkts. 17 at 4–5 & 17-1 at 4–5. This can hardly be considered an "immediate or continuous pursuit" of a suspect. In fact, according to the police reports the Defendants have asked the Court to rely on, the Defendants researched Hamilton on the "NCIC/FCIC database" before going to his house to arrest him. Dkt. 17-1 at 9. If there was enough time for this research, the officers were not in "hot pursuit" of the suspect.

The burden is on the Defendants to prove the exigent circumstance. The Defendants have not pointed to any case law which allows for the pursuit of a suspect into their home over a day after the underlying misdemeanor. Instead, the case law allows for the "hot pursuit" of a suspect "from the scene of the crime"

which is not what occurred here. *See Bratt v. Genovese*, No. 8:13-CV-3210-T-36AEP, 2015 WL 12835684, at \*5 (M.D. Fla. Nov. 23, 2015), aff'd, 660 F. App'x 837 (11th Cir. 2016) (affirms the requirement of immediate or continuous pursuit "from the scene of the crime").

The Eleventh Circuit has further emphasized the limited nature of the hot pursuit doctrine when dealing with entry into a home. In a recent case, the Eleventh Circuit held that an officer following and arresting the plaintiff inside his home after talking with him outside on his porch violated clearly established law. *Bailey v. Swindell*, No. 18-13572, 2019 WL 5204617 (11th Cir. Oct. 16, 2019). In *Bailey* the officer went to the plaintiff's home to investigate a call made by his estranged wife. *Id.* at 1. When the officer arrived at the home the plaintiff, and his brother and mother, exited the home and talked with the officer on the porch. *Id.* at 2. The officer repeatedly requested to speak with the Plaintiff alone by his patrol car and asked the other family members to leave; all these requests were refused. *Id.* When the plaintiff announced that he was going back inside and went into the house, the officer, without announcing his intentions, tackled him into the living room and said, "I am going to tase you." *Id.* The court reiterated that "the Supreme Court has drawn a 'firm line at the entrance to the house.'" *Id.* at 3 (citing *Payton v. New York*, 445 U.S. 573, 590 (1980)). The Eleventh Circuit stated: "We have expressly refused to read *Santana* 'as allowing physical entry past *Payton*'s firm

line . . . without a warrant or an exigency.'" *Id.* at 4 (citing *McClish v. Nugent*, 483 F.3d 1231, 1246 (11th Cir. 2007)). The Eleventh Circuit specifically noted that in *Santana* it "was only after officers shouted 'police' that Santana retreated fully inside her house." *Id.* at 5 (citing *Santana*, 427 U.S. at 40).

Here, taking the facts according to Hamilton, the officers did not identify themselves until they were already inside his home. Dkt. 17 at 5. According to the Second Amended Complaint, Hamilton was standing on his patio when he saw "men dressed in dark clothing running towards his home." *Id.* at 4–5. And, according to Hamilton, the Defendants "never identified themselves as police officers." *Id.* He was not fleeing from a crime scene but rather was concerned for his safety from an unknown threat approaching his home. In *Bailey*, the Eleventh Circuit, taking the facts in the light most favorable to the plaintiff found "that the threat and tackle [by the officer] occurred only after Bailey had retreated entirely into the house, so 'hot pursuit' provides no justification for the warrantless entry here." *Bailey*, 2019 WL 5204617, at 5. The Eleventh Circuit specifically noted that "[i]f *Santana* were understood to cover warrantless arrests 'set in motion' inside a home, then the hot-pursuit exception would quite literally swallow *Payton's* rule." *Id.* This means, taking the facts in the light most favorable to Hamilton, the pursuit of him did not beginning until inside his home and therefore "hot pursuit" cannot justify warrantless entry.

To rule otherwise would be to allow officers to wait outside a suspect's house for the suspect to exit, then proceed to chase them back in under the concept of hot pursuit. The Defendants have provided no case law the establishes this as the intent of the "hot pursuit" exigent circumstance doctrine and this Court declines to extend the doctrine to cover such conduct. The underlying rational behind the exigent circumstance doctrine is that "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007) (quotation marks and citations omitted). Here there was no "urgent need for immediate action" as evidenced by the 31-hour delay between the underlying offense and the officers approaching Hamilton's home. In that time the officers organized the use of a K-9 unit and found Hamilton in the NCIC/FCIC database—but did not get a warrant for his misdemeanor arrest. Instead, the Defendants arrived, warrantless, at Hamilton's home in black uniforms after 11:00 pm the following day to arrest him. This was not an exigent circumstance because as of the time the officers approach Hamilton's home there was no urgent need for immediate action. Any urgency that may have existed because of the underlying offense dissipated in the 31 hours between the underlying offense and approaching Hamilton's home.

Further, unlike in *Santana* there was no risk that Hamilton could destroy evidence related to the underlying crime once he knew of the police presence. The

Defendants have not pointed to any potential evidence that was at risk of being destroyed if they allowed Hamilton back into his home and this Court could not find any. Nor was there any ongoing or imminent risk of danger to anybody.

The underlying offense was a misdemeanor battery, for which the officers already had a sworn written statement from the victim along with photographs of the victim's "minor injuries" as evidence.[1] Dkt. 17-1 at 4–5. The Eleventh Circuit recognized that "[t]he *Santana* Court also relied in part on 'a realistic expectation that any delay would result in destruction of evidence.'" *Id.* (citing *Santana*, 427 U.S. at 43). As in *Bailey*, there is no reasonable claim that this was an issue for Hamilton's case. There are no allegations that a weapon was used in the alleged act, so there was not further evidence that could be tampered with.

Thus, the Defendants have failed to prove there was an exigent circumstance to justify the warrantless entry into Hamilton's home. Since "searches and seizures inside a home without a warrant are presumptively unreasonable" the constitutional right was clearly established at the time of the incident. *Payton v. New York*, 445 U.S. 573, 586 (1980). Further, the Eleventh Circuit held in 2012 that the meaning of "some sort of chase" is "the 'immediate or continuous pursuit'

---

[1] Hamilton alleges that the misdemeanor battery was subsequently reduced to a disorderly conduct violation. Dkt. 17 at 7. The Defendants have not disputed this claim. This is further evidence that this case should be analyzed under the Supreme Court's cautioning and hesitation in *Welsh* to find exigent circumstances when the underlying offense is relatively minor.

of a suspect," therefore the lack of exigent circumstance was clear at the time. *Hazleton*, 488 F. App'x at 352. The Eleventh Circuit recently reaffirmed that there is clearly established law that officers cannot "point to *Santana* as a source of uncertainty in the law." *Bailey*, 2019 WL 5204617, at *5.

Therefore, the Court denies the Defendants' Motion to Dismiss on the Fourth Amendment illegal seizure claim. Since in the Eleventh Circuit, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim[,]" the Court withholds ruling on the excessive force claim. *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000); *see also Hazleton*, 488 F. App'x at 353 ("Material issues of fact also exist concerning whether the use of force against Plaintiff was reasonable because if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest.") (internal quotation and citation omitted).

IV.     Fourteenth Amendment Claim

To the extent that Plaintiff is alleging a separate Fourteenth Amendment claim, it is insufficiently pled and not a discrete claim. The Plaintiff has not pointed to any protected interest he was deprived of other than those that would be protected by the Fourth Amendment. To the extent his claim relates to the

allegation of his illegal arrest, it is duplicative of his Fourth Amendment claim. *See Morris v. City of Orlando*, No. 6:10-CV-233-ORL, 2010 WL 4646704, at *6 (M.D. Fla. Nov. 9, 2010). As for an excessive force claim, the Fourth Amendment protects the rights of individuals already seized and the Fourteenth Amendment protects the rights of those who have not yet been seized. *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019). As any alleged excessive force occurred after the Plaintiff was seized, he is protected by the Fourth not the Fourteenth Amendment.

The Plaintiff appears to be only alleging the Fourteenth Amendment in so far as it prohibits unreasonable searches and seizure by state officers. *Elkins v. United States*, 364 U.S. 206, 213 (1960). This claim, however, is analyzed under the Fourth Amendment and not as a separate Fourteenth Amendment claim. *See Bates v. Harvey*, 518 F.3d 1233, 1242–43 (11th Cir. 2008). As such, the Fourteenth Amendment claim is not a discrete claim subject to separate dismissal.

## CONCLUSION

The Court denies the Defendants' motion. Dkt. 31. Defendants are instructed to answer the Plaintiff's Second Amended Complaint within fourteen (14) days. Dkt. 17.

**DONE AND ORDERED** at Tampa, Florida, on October 31, 2019.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record
Plaintiff, pro se